# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 18, 2016

Lyle W. Cayce
Clerk

————

No. 15-10708

————

RANDI HYATT, individually, as the next friend of her minor child C.W.H., and as the representative of the ESTATE OF JASON HYATT; LEA WILKINS, as the representative of her minor child C.H.; ALEXIS HYATT; VICKIE DEAR,

> Plaintiffs - Appellants

v.

BRIANNA THOMAS; CHARLES TURNER; MARK ADMIRE; BRANDY CAUBLE,

> Defendants - Appellees

————————————

Appeal from the United States District Court
for the Northern District of Texas

————————————

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

The family of Jason Hyatt appeals the district court's grant of summary judgment in favor of Officer Brianna Thomas on their § 1983 claim related to Hyatt's suicide while in police custody. Because we find that Thomas responded reasonably to Hyatt's known suicide risk, we hold that she was not deliberately indifferent and thus was entitled to qualified immunity. We therefore AFFIRM the judgment of the district court.

No. 15-10708

I

On December 10, 2012, appellant Randi Hyatt, Jason Hyatt's wife, received a call from Hyatt's coworkers, who informed her that Hyatt had left work unexpectedly and that they were concerned about his wellbeing. Randi called 911 and informed Thomas, a Callahan County, Texas jailer and dispatcher, that her husband "was suicidal, had tried to commit suicide before, and that [she] would not be calling the police if [she] did not think something really bad was happening." Thomas dispatched officers to perform a welfare check, and Hyatt was soon located and placed under arrest under suspicion of driving while intoxicated. When Thomas called Randi to inform her that Hyatt had been stopped and to give her his location, Randi again stated that her husband was suicidal. Randi arrived while her husband was being arrested and informed the arresting officers that Hyatt "had tried to commit suicide before and needed to be watched."

Hyatt was taken to the Callahan County jail, where Thomas, who was trained in the assessment of suicide risk and screening for mental health issues of inmates, booked him and completed a "Screening Form for Suicide and Medical and Mental Impairments." In response to Thomas's questions, Hyatt stated that he had been prescribed antidepressants but was not taking them correctly, that he was feeling "very depressed," and that he attempted suicide two months earlier because he was off his medication; however, Hyatt answered "No" when asked if he was "thinking about killing [himself] today." Thomas observed that he was under the influence of drugs and alcohol, and noted "1/2 bottle of vodka, Xanax" in the "Comments" section of the form. Despite his answers to the questionnaire, Thomas observed that Hyatt "came across as very happy and generally in a good mood," and later stated in an affidavit that "[a]t no time did [she] consider him to be a suicide risk and at no time did he exhibit any actions which would have made [her] consider him to

2

be a suicide risk." Nevertheless, "due to his history of depression and suicide attempts," Thomas refused to issue Hyatt the thin sheet or hygiene items typically given to prisoners when she processed him into the jail. On two prior occasions, inmates at Callahan County jail had used the thin sheets to hang themselves from bars in their jail cells.

Hyatt was issued a standard jail uniform and placed in a cell under video surveillance. However, a blind spot in surveillance-camera coverage prevented officers from seeing the toilet area of the cell. When Thomas's shift ended at 9:00 pm, she informed her shift relief, Jailer Charles Turner, about Hyatt's intoxication and history of suicide attempts and advised him "of the need to keep an eye out for suspicious behavior." Turner checked on Hyatt throughout the night. Before his shift ended at 7:00 am, Turner made Hyatt breakfast and delivered it to him. He later recalled that Hyatt "seemed normal and [was] acting in a regular manner," and that Hyatt "gave no indication of suicidal tendencies." Turner was relieved by Mark Admire around 7:00 am; he told Admire that Hyatt had been booked for DUI and that his family would be in soon to "bond him out of jail." Shortly after his shift began, Admire was advised by another jailer that Hyatt could not be seen from the video monitor. Although the jailer suspected that Hyatt was using the bathroom, she dispatched Admire to check on him. At approximately 8:02 am, Admire discovered that Hyatt had hanged himself in the cell bathroom with a plastic garbage bag. EMS was contacted; personnel arrived at the jail at 8:12 am and determined that Hyatt was dead.

In 2014, Hyatt's widow, mother, and children (collectively, the Hyatts) filed suit under 42 U.S.C. § 1983, the Rehabilitation Act, and the Americans with Disabilities Act against Callahan County; Callahan County Sheriff John Windham; and five Callahan County Jailers, including Thomas. The plaintiffs alleged, *inter alia*, that the defendants acted with deliberate indifference to

No. 15-10708

Hyatt's right to protection from harm guaranteed by the Fourteenth Amendment. The defendants filed a motion for summary judgment, asserting that they were each entitled to qualified immunity. The defendants contended that they did not fail to protect Hyatt from a known risk of suicide but rather "took steps to protect him from same," and argued that they did not intentionally disregard Hyatt's suicidal tendencies.

The district court ultimately denied summary judgment as to Sheriff Whindham but granted summary judgment as to the remaining individual defendants. With respect to Thomas, the district court found:

> Plaintiffs have failed to direct the Court to specific facts that could be interpreted by a reasonable jury as showing that Defendant Thomas in fact drew the inference that Mr. Hyatt was an imminent or high risk for suicide (requiring an even higher level of care and observation than that which was being given him) or that Defendant Thomas deliberately ignored such a high level of risk.

The district court therefore concluded that no genuine issue of material fact precluded Thomas from being entitled to qualified immunity. This appeal followed.

II

A. Standard of Review

We review the district court's summary judgment decision de novo and apply the same standard that was used by the district court. *Roberts v. City of Shreveport*, 397 F.3d 287, 291 (5th Cir. 2005). Summary judgment is appropriate if the record discloses "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine

No. 15-10708

if the summary judgment "evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Id.*

"Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right." *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). Once a defendant asserts the qualified immunity defense, "[t]he plaintiff bears the burden of negating qualified immunity." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "A plaintiff seeking to overcome qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Despite this burden-shifting, all reasonable inferences must be drawn in the non-movant plaintiff's favor. *Brown*, 623 F.3d at 253.

### B. Deliberate Indifference

The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Although pretrial detainees like Hyatt are not protected by the Eighth Amendment, we have held that "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (*Hare II*).

In *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), the Supreme Court explained that to be deliberately indifferent to an inmate's needs in violation of the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

No. 15-10708

he must also draw the inference." Therefore, to avoid liability, "[p]rison officials charged with deliberate indifference might show . . . that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844.

Furthermore, evidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference. As the Supreme Court explained in *Farmer*, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." 511 U.S. at 844. We have further observed that, "while . . . the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be." *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 328-29 (5th Cir. 1998) (*Hare III*) (quoting *Rellergert v. Cape Girardeau Cty.*, 924 F.2d 794, 797 (8th Cir. 1991)). What is clear is that, even if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability. *See Davidson v. Cannon*, 474 U.S. 344, 347 (1986).

### III

On appeal, the Hyatts argue that the evidence, considered in the light most favorable to them, suggests that Thomas: (1) knew that Hyatt was at significant risk of committing suicide; and (2) ignored this risk when she failed to withhold or remove obvious dangers from Hyatt's cell and failed to follow Callahan County's "suicide prevention policy." We will consider each of these arguments in turn.

No. 15-10708

## A. Thomas's Subjective Awareness of Risk of Harm

In support of their contention that Thomas "knew Mr. Hyatt was at significant risk of committing suicide," the Hyatts point to evidence that she knew about Hyatt's recent suicide attempt and his history of depression; that she was told by Randi that Hyatt was suicidal; and that she did not issue him certain items "due to his history of depression and suicide attempts." We agree that, taken in the light most favorable to the Hyatts, this evidence could lead a reasonable jury to conclude that Thomas was subjectively aware of a substantial risk that Hyatt would attempt to commit suicide.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Thomas reported that, "due to his history of depression and suicide attempts," she refused to issue Hyatt the thin sheet or hygiene items typically given to prisoners when she processed him into the jail. Furthermore, she informed her shift relief, Jailer Turner, of Hyatt's intoxication and history of suicide attempts and advised him "of the need to keep an eye out for suspicious behavior." Despite Hyatt's statement that he was not presently considering suicide and Thomas's averment that she did not consider him to be a suicide risk, one could reasonably draw the inference from Thomas's actions that she was aware of a risk that Hyatt would harm himself if given the opportunity. *See Flores v. Cty. of Hardeman, Tex.*, 53 F.3d 1280, 1280 (5th Cir. 1995) (unpublished) (finding genuine issue of material fact as to officer's knowledge of detainee's suicidal tendencies, despite statement from officer and other officials that detainee "had not shown such tendencies," where officer placed detainee in observation cell, denied him sheets and a blanket, and took other added precautions).

7

We next must consider whether, viewing the evidence in the light most favorable to the Hyatts, a jury could find that Thomas was aware of a "sufficiently substantial" risk to Hyatt's safety. Although Hyatt indicated that he did not want to kill himself, he stated that he was feeling "very depressed," and Thomas was aware that he had a history of depression, that he had recently attempted suicide, and that his wife believed that he was suicidal. A reasonable jury could infer that, as an officer trained in the assessment of suicide risk and screening for mental health issues of inmates and likely aware that the prison had had recent experience with detainee suicides, Thomas appreciated that Hyatt presented a significant risk of suicide. Taken in the light most favorable to the Hyatts, the evidence thus creates a genuine dispute as to whether Thomas was subjectively aware of Hyatt's substantial risk of suicide.

Thomas argues that the Hyatts cannot satisfy the awareness-of-risk requirement without evidence that she had some knowledge that the plastic bag Hyatt used to hang himself was present in his cell. However, the Hyatts are not required to demonstrate that Thomas was aware of the particular means that Hyatt would ultimately use to hurt himself, only of the substantial risk that he might try to hurt himself. The Supreme Court made this point clear in *Farmer*, when, considering a claim of deliberate indifference to the risk of inmate-on-inmate violence, it observed:

> [A] prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner

faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

511 U.S. at 843. In *Hernandez ex rel. Hernandez v. Texas Department of Protective & Regulatory Services*, we cited *Farmer* and held that "[a]lthough deliberate indifference is determined by a subjective standard of recklessness, this court has never required state officials to be warned of a *specific* danger." 380 F.3d 872, 881 (5th Cir. 2004) (internal citation omitted) (emphasis added). Thomas's awareness of the substantial risk that Hyatt would attempt suicide if given the opportunity would therefore satisfy the awareness requirement.

### B. Thomas's Response to Risk of Harm

A prison official acts with deliberate indifference only if "he knows that inmates face a substantial risk of serious bodily harm . . . [and] disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *see also Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir. 1992) ("The failure to provide pre-trial detainees with adequate protection from their known suicidal impulses is actionable under § 1983 as a violation of the detainee's constitutional rights."). Although "we cannot say that the law is established with any clarity as to what those measures must be," *Hare III*, 135 F.3d at 328-29 (quoting *Rellergert*, 924 F.2d at 797), we conclude that in this case, Thomas responded reasonably to Hyatt's risk of suicide. She withheld from Hyatt the most obvious means for self-harm and placed him under continuous, if ultimately imperfect, video surveillance. Thomas also took care to inform her relieving officer that Hyatt was a potential suicide risk and that he needed to be observed; it was not until after that officer was relieved that Hyatt hanged himself. It is uncontested that she had no knowledge of the presence of the plastic bag in Hyatt's cell. Thomas's failure to inspect Hyatt's cell and retrieve the plastic bag, and any other potential ligatures, was perhaps negligent, *see Estate of Pollard v. Hood Cty., Tex.*, 579

No. 15-10708

F. App'x 260, 266 (5th Cir. 2014), but "negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State," *Hare II*, 74 F.3d at 645; *see also Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000) ("[T]o be considered deliberately indifferent to a known suicide risk, an officer's acts must constitute at least more than a mere 'oversight.'").   Finally, although failure to properly execute a suicide prevention policy may amount to deliberate indifference, *see Estate of Pollard*, 579 F. App'x at 266, in this case, considering the steps that Thomas did take, any potential noncompliance with Callahan County's policy would have been at most negligent.[1]   We therefore hold that, while not ideal, her failure to exercise even greater care to avoid Hyatt's suicide did not amount to deliberate indifference.  *See Farmer*, 511 U.S. at 844; *Davidson*, 474 U.S. at 347.

IV

America faces an epidemic of suicide by individuals in custody. According to the Bureau of Justice Statistics, suicide has been the leading cause of death in jails every year since 2000.  Margaret Noonan et al., U.S. Dep't of Justice, *Mortality in Local Jails and State Prisons, 2000–2013— Statistical Tables* 1 (2015), *available at* http://www.bjs.gov/content/pub/pdf/ mljsp0013st.pdf.  In 2013, more than a third of jail inmate deaths were due to suicide.  *Id*.  In 2015, there were 33 suicides in county jails in Texas.  Dana Liebelson & Ryan J. Reilly, *Sandra Bland Died One Year Ago*, Huffington Post – Highline (July 13, 2016), http://highline.huffingtonpost.com/articles/en/

---

[1] Our conclusion is based in large part on the fact that the practical force of Callahan County's policy is unclear from the record. For example, the policy states: "When an inmate has been identified as demonstrating a need for mental health care services, he/she will be referred to MHMR services and the local magistrate will be notified as prescribed in the Health Services Plan."   However, the policy does not describe how, when, or by whom an inmate is to be identified as demonstrating such a need.

10

sandra-bland-jail-deaths/. Yet preventing detainee suicides is far from impossible. Brazos County, Texas, makes an effort to keep people with mental health issues out of jail, diverting individuals to mental health facilities instead of charging them with a crime. The county jail also screens inmates twice, first with an officer and then with a nurse. As a result, the jail, which houses roughly 650 inmates, has had only one suicide in the past decade. *Id.*

It is clear that more can and must be done to address suicides in prisons and jails. Nevertheless, "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Officer Thomas took measures to prevent Jason Hyatt's suicide: she withheld from him the most obvious potential ligature, placed him under video surveillance, and directed her relieving officer to keep a close watch over him. Although these measures were ultimately, and tragically, insufficient, we cannot say that they constitute deliberate indifference. The judgment of the district court granting summary on grounds of qualified immunity is therefore AFFIRMED.